## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LOUANNE CYPERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-CV-0803-CVE-FHM |
| | ) |
| INDEPENDENT SCHOOL DISTRICT NO. | ) |
| I-050, OSAGE COUNTY, a/k/a Prue Public | ) |
| Schools, RON MEADOWS, GERALD | ) |
| JACKSON, VALERIE TRASTER, SYLVIA | ) |
| HENDRICKS, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Now before the Court is Defendants' Motion for Summary Judgment (Dkt. # 17). Plaintiff

Louanne Cypert, a former employee of Independent School District No. I-050, Osage County,

Oklahoma (the School District or the District), brings the following claims against the District and

individual members (or former members) of the District Board of Education (the Board of Education

or the Board): claims under 42 U.S.C. § 1983 for violation of her substantive and procedural due

process rights and free speech rights; a claim under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e et seq. (Title VII) for gender discrimination; a claim under the Age Discrimination

in Employment Act, 29 U.S.C. § 621 et seq. (ADEA) for age discrimination;[1] and state law claims

for breach of employment contract, intentional interference with her employment contract, and

---

[1]      Cypert's complaint does not specify the statutory bases for her gender and age discrimination claims.  See Dkt. # 2, at 10-11.  However, her response to defendants' motion to summary judgment shows that she seeks to bring these claims under Title VII and the ADEA.  See Dkt. # 29, at 28-29.

conspiracy to interfere with her employment contract and violate her due process and free speech rights.  Dkt. # 2.  Defendants seek summary judgment on all claims.  Dkt. # 17.

On August 30, 2010, the Court entered an Opinion and Order (Dkt. # 41), granting in part and denying in part defendants' Motion to Strike Inadmissible Evidence and Improper Argument in Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. # 33). The Court will not consider the evidence stricken from Plaintiff, Louanne Cypert's, Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. # 29).

## I.

Cypert is a former employee of the School District.  The individual defendants, Ron Meadows, Gerald Jackson, Valerie Traster, and Sylvia Hendrix,[2] were four of the five members of the Board of Education during some times relevant to this matter.  Meadows was not on the Board at the time Cypert's employment was terminated.

Cypert began her employment with the School District in September 2001.  Dkt. # 18-2, at 2.  She worked in the lunchroom.  Id.  At some point, she became the high school secretary.  See id. at 3.  She also received the extra duty assignment of concession stand director.  At various times during her employment, Cypert received other extra duty assignments, including cheerleading sponsor.

A.     Cypert's Employment Contracts

On October 6, 2008, Cypert and the Board entered into an Annual Employment Contract for Support Personnel.  The contract provided that Cypert would work eight hours per day, five days

---

[2]     Hendrix's name was mis-spelled in the Complaint.

2

per week for 200 days per year, and that she would be compensated at a rate of $9.30 per hour.  The

"Employment Security" section provided:

> After one year of continuous employment with the School District as a "full time
> support employee," as defined by the School District, Employee shall be entitled to
> the employment security protection of Oklahoma law and shall be subject to
> discharge, suspension or demotion during the term of this Contract only for cause
> (including lack of funds or lack of work) as specified in the rules and regulations of
> the School District pursuant to the School District's Policy Statement for Suspension,
> Demotion, Termination or Nonreemployment of Support Employees and subject to
> the due process hearing rights provided in said Policy Statement.

Dkt. # 18-3, at 2-3.

The "Nonreemployment" section provided:

> Any employee entitled to a due process hearing under Oklahoma law in connection
> with a suspension, demotion or termination shall also be entitled to a due process
> hearing prior to any decision by the School District not to reemploy such employee
> upon the expiration of this Contract.  Such hearing shall be conducted in the manner
> set forth in the School District's Policy Statement for Suspension, Demotion,
> Termination or Nonreemployment of Support Employees.

Dkt. # 18-3, at 3.

B.      The Investigation into the School District's Financial Condition

On November 6, 2008, Meadows and the Board's counsel discussed authorizing the law firm

of Rosenstein, Fist and Ringold to conduct a review of District finances.  Dkt. # 29-13, at 1. Tim

Green was hired to perform a review.  The superintendent at that time was Randy Cottrell.  Green

found that the District's finances were in disarray, and that the treasurer had not been keeping proper

records.  Cottrell was suspended and, subsequently, his employment terminated.  At some point after

Cottrell's termination, the Board hired Phyllis Tarrant as interim superintendent.

Green made a written report to the Board on November 20, 2008. Dkt. # 29-15, at 1.  He met

with the Board on November 25, 2008.  Dkt. # 29-14, at 3. At some point in late 2008, the high

school principal was told to stop spending school funds.  Dkt. # 29-9, at 9. Dawn Bunch was removed as District Treasurer by unanimous vote of the Board members present[3] at the November 25, 2008 Board meeting.  Dkt. # 29-16, at 3.

Douglas Jones was hired as the assistant treasurer for the District on January 1, 2009.  Dkt. # 18-10, at 3.  In February 2009, the Board voted to terminate the employment of Ginger James, the elementary school principal, and Deborah Tennison, the high school principal.  This decision was based on Jones's prediction that the District would not have sufficient funds to start the next school year.  Jones admitted that he did not have knowledge of specific expenditures in February 2009, but based his predictions on the District's past spending rates.  Dkt. # 29-19, at 6.

Jones prepared a treasurer's report, fund balance history, and expense projections for the Board in preparation for their June 2009 meeting.  Dkt. # 18-10, at 9.  The fund balance history stated that the fund balance was approximately $188,000 in May 2009.  Id. at 8-9.  At that time, Jones predicted that the ending fund balance for the 2008-09 school year would be $161,639.19.[4] Id. at 10; Dkt. # 18-11, at 3.  Jones believed that the District needed a carryover of at least $250,000 to start the 2009-10 school year.  Dkt. # 18-10, at 12, 18.  Jones also expected that aid funding from the state would decrease significantly for the 2009-10 school year.  Jones was advising all of the

---

[3]     The four individual defendants voted to remove Bunch as treasurer.  Board member Don Horton was not present.  Bunch filed a suit in this Court making allegations similar to Cypert's.  On August 23, 2010, the Court entered summary judgment in defendants' favor on Bunch's federal law claims and dismissed Bunch's state law claims for lack of jurisdiction.  Case No. 09-CV-0458-CVE-FHM, Dkt. # 54.

[4]     In January and February, Jones had projected a fund balance of zero at the end of the school year.  He testified that the District was receiving more income by May 2009 because of personnel layoffs that occurred earlier in the year (including the terminations of Bunch, Tennison, and James) and the District's receipt of federal stimulus funds. Dkt. # 18-10, at 10. Since February, spending had been frozen and some personnel had been laid off.  Id.  at 12.

school districts for which he worked to hold all expenses to an absolute minimum. Id. at 13.  In May

2009, Jones had recommended to Tarrant that the District exercise caution, not incur any

unnecessary expenses, and "that they needed to be prepared for a very difficult year this year."  Dkt.

# 18-10, at 17.

C.     Cypert's Non-Reemployment

On May 8, 2009, Tarrant sent a letter to Cypert notifying her that "the Board of Education

intends to consider and act on whether you should not be reemployed with the School District for

the 2009-10 fiscal year.  The cause for your possible non-reemployment is as follows: lack of funds,

lack of work and best interests of the School District."  The letter notified Cypert of her right to a

hearing.  Dkt. # 18-4, at 1.  Attached to the letter was a "Recommendation of Nonreemployent of

Support Personnel."  Dkt. # 18-4, at 2.  It stated, in relevant part:

> The District is currently in the midst of a severe financial crisis.  It is possible
> that the District may deplete its funds prior to the end of the 2008-2009 fiscal year
> and will be unable to pay all of its 2008-2009 obligations.  At worst, the District will
> be required to end the year with a zero fund balance.  In order to meet its financial
> obligations for the 2009-2010 fiscal year, the District must address this financial
> emergency by reducing expenditures.  Sufficient reductions for the next school year
> can only be made in personnel expenditures.  The District's support employee costs
> are excessive and should be reduced.
>
> As of May 8, 2009, the enrollment of the District was 313 students . . . .
> During a time of economic crisis, these enrollment numbers do not justify the hiring
> of any teacher aides . . . or the present number of administrative office support staff
> (e.g., secretary) [ ].
>
> The nonrenewal of your support employee contract for the current positions
> of (1) teacher aide, or (ii) [sic] administrative office support staff (e.g., secretary),
> will have the least impact on the quality of the education provided to students and
> is in the best interest of the District.

Dkt. # 18-4, at 2.  Tarrant issued notices of possible non-reemployment to two full-time teachers,

one part-time teacher, and all support staff (with the exception of cafeteria and custodial workers).

Dkt. # 18-5, at 2. She sent notices to approximately ten employees total.  Id.

Cypert requested a hearing before the Board.  Dkt. # 18-6, at 1.  She was the only employee to do so.  Dkt. ## 18-2, at 33; 18-5, at 3.  She was notified that her hearing would occur during the June 8, 2009 Board meeting.  Dkt. # 18-7, at 1.

Jackson, Hendrix, Traster, Don Horton, and Violet Reese were the members of the Board at the time of the June 8, 2009 meeting.[5]  Horton was absent from the meeting.  Dkt. # 18-8, at 1.  Although Meadows was not on the Board at the time, Cypert testified that he "still carries a lot of weight with the board members that are there."  Dkt. # 18-2, at 38.  Jones was not able to attend the meeting.  Dkt. # 18-8, at 3.

At the beginning of the hearing, Cypert's counsel asked the board members if they had any conversations with Meadows in the past year about Cypert's employment.  Dkt. # 18-8, at 5.  He also asked "I want to make sure that no one on the board has made any arrangements, had any conversations, made any allegations, you know we have done this before.  You know about getting rid of certain people.  I want to make sure I am asking the board tonight, I am giving you the opportunity to say this hasn't happened."  Dkt. # 18-8, at 6-7.  Each of the board members said it did not happen.  Id. at 7.  Tarrant testified in favor of her recommendation.  She described the current state of the district's finances as "[m]eager at best.  We have a serious lack of funds to carry over."  Dkt. # 18-8, at 11.  She testified "currently our payroll has taken about seventy-four percent of our budget.  At this point we are making some recovery but, not enough that we would have an adequate fund carry over for the 2009-10 school year."  Id. at 11.  She testified that she and the board looked at areas other than personnel in which cuts could be made, including moving the students to one building and moving to a four day school week.  Id. at 12.  She testified that "I think

_____

[5]        Reese replaced Meadows at this meeting.  Meadows was not present.  Dkt. # 18-8, at 1, 4.

the number of children we have, that we have an unusual amount of Support Personal [sic] as far as aides.  Depending on how they figure the offices there may be more than adequate secretaries." Id. at 12.

Tarrant testified regarding Jones's treasurer's report.  She testified that the auditor predicted that the general fund balance would be negative $66,000 at the end of the 2008-09 school year.  Id. at 14.  Jones's prediction was a fund balance of $162,000, fifty thousand of which could not be used for administrative personnel.  Id. at 15.  Tarrant testified that this was less than half of the minimum necessary carryover for the school district.  Id. at 15.  The essence of Tarrant's recommendation was that the Board needed to make a lot of decisions about how to save money before they decided to reemploy any support staff, and which support staff to reemploy.  Dkt. # 18-8, at 34.  Cypert's counsel cross-examined Tarrant.

Cypert testified on her own behalf.  She testified that her workload had not decreased due to lack of work.  Dkt. # 18-8, at 38.  With regard to the District's financial condition, she said "I don't know what the financial status is of the school.  I know they discussed it, it has been bad.  Then I also know Doug Jones said that things were turning around and it was starting to look better and they probably weren't going to have to borrow money to start the next school year." Dkt. # 18-8, at 39.  Cypert was concerned that she was going to be replaced and said "I don't know why they would need to replace me.  I've never been written up for anything." Id.  Cypert testified that she believed this was happening to her because of her support for the grand jury petition and her involvement with alleged theft by the son of a former board member.  Dkt. # 18-8, at 40.

The Board went into executive session, and Tarrant joined them.  Dkt. # 18-8, at 48.  The Board voted unanimously (with Horton absent) to adopt findings of fact, which essentially mirrored

the facts outlined in Tarrant's recommendation.  Dkt. # 18-8, at 49.  The Board also found that the District's enrollment numbers "and the likely closin[g] of one of the District's buildings do not justify the present number of administrative office support staff," id. at 49, and "[t]he District's support employee costs are excessive and should be reduced."  Id.  The Board voted unanimously to non-reemploy Cypert for the 2009-10 school year.  Id. at 50.  Each of the defendant Board members who voted at the meeting state that he or she based his or her vote solely on the evidence and testimony presented at the due process hearing, and had not prejudged or formed an opinion on the matter prior to the meeting.  Dkt. ## 18-12, at 2-3; 18-13, at 2-3; 18-14, at 2-3.  Each also states that his or her vote was not based on any statements made by Tarrant during the executive session. Id.  Meadows was not on the Board at the time the vote was taken.  Dkt. # 18-16, at 2.  He states that, while he was a member of the Board, he did not request that Cypert be recommended for non-reemployment  for the 2009-10 school year.  Id.

Later at the same board meeting, the possibility of moving to a four-day school week was discussed.  Dkt. # 18-8, at 58-62.  The Board voted unanimously to move to a four-day school week. Dkt. # 18-8, at 60.

In fact, the District ended the 2008-09 school year with a fund balance of approximately $330,000.  Dkt. # 18-10, at 14.  Jones testified that this was made up of approximately $260,000 of reduced expenses and $59,000 of unanticipated federal stimulus funds.[6]  Dkt. # 18-10, at 12, 17. Jones testified that the reductions in expenses "really started to kick in in the last two months, May and  June."   Dkt. # 18-10,  at 15.   He  testified  that  a  significant  amount  of  the  reduction  in

---

[6]     The federal stimulus money was restricted and could only be spent on special education and programs for economically disadvantaged students.  Dkt. # 18-10, at 11.

expenditures came from reduced payroll expenses.  Dkt. # 29-19, at 5.  Jones testified that, if the District had maintained its expenses at the 2007-08 level for the 2008-09 school year, the District would have ended up with a fund balance of approximately $60,000, $59,000 of which would have been stimulus funds.  Dkt. # 18-10, at 16.

Cypert's proffered school finance expert, Bill Bentley, asserts that a $322,000 fund balance carryover does not constitute a financial crisis.  Dkt. # 29-21, at 8.  He believes that Jones's conclusions and predictions in February and June were incorrect.  Id. at 2,7.  He does not discuss or respond to Jones's explanations for the differences between his predictions and the eventual carryover at the end of the 2008-09 school year.[7]  He also alleges that the Board paid "an exorbitant amount of new expenses in legal fees paid to Rosenstein Fist & Ringold in 2008-09."  Dkt. # 29-21, at 8.

Cypert did not re-apply for the high school secretary position for the 2009-10 school year. Dkt. # 18-23, at 2.  Tarrant testified that Cypert "forced the issue" by requesting a hearing on her non-reemployment before the Board was ready to make a decision about whether any support staff would be non-reemployed.  Dkt. # 29-22, at 2-3.  She testified that Cypert "demanded an answer, and the only answer they could give her at that point was, '[w]e don't have any money, so we can't hire you back at this point.'"  Id. at 3.  She testified that the other notified support staff were re-hired because they did not ask for hearings and "so they still left it open . . . ."  Id. at 4.  Tarrant's

---

[7]     Bentley's argument is, essentially, that the predicted financial crisis did not come to pass and, therefore, it was a sham.  See Dkt. # 29-21, at 2 ("[a]fter learning of the Prue School District's carryover of 332,991.81 for the 2008-09 school year, which occurred only 4 months after the due process hearing where Doug Jones said the school was in crisis based on the numbers provided to him, I believe the whole financial crisis was a sham and misrepresented to find some reason to fire Ginger James and Deborah Tennison").  It does not follow that the predictions were a sham because merely because they did not come true.

understanding was that "if [Cypert] had not asked for the hearing and forced them to give her an answer at that exact moment . . . she would have been hired back." Id. at 4.  Cypert testified that it was common practice in the past for non-reemployed staff to have the first right to be re-hired for their positions. Dkt. # 18-2, at 43.  The position of high school secretary did not exist for the 2009-10 school year.  Dkt. # 18-2, at 2.

D.      Relationship Between Cypert and Defendants

Cottrell testified that there were two camps of people in Prue: those that supported Meadows and three other School Board members, and those that were opposed to Meadows.   Dkt. # 29-6, at 5. Cottrell testified that Tennison, James, and Bunch fell into the camp that opposed Meadows, but did not mention Cypert in that testimony. Id.

Prior to the 2008-09 school year, Tennison contacted law enforcement and alleged that Meadows's son had taken a computer from the school. Dkt. ## 18-17, at 2; 29-9, at 4.  Tennison testified at a related criminal hearing. Dkt. # 29-9, at 4.  Cypert's son stated that he saw Meadows's son take the computer. Dkt. # 18-17, at 3.  Meadows was aware of Cypert's son's involvement. Id.

Melvina Prather was hired as the interim superintendent of the School District on April 3, 2008.  Dkt. # 29-3, at 2.  She testified that on April 4, 2008, Meadows told her that "he had made promises when he ran for school Board to get rid of some of the staff at the Prue School District," and that "there were certain people [at the school] that he wanted to see gone," including Cypert. Dkt. # 29-4, at 2-3.  Prather recalls that "a letter went around stating that changes would be made and [Meadows] would, you know, he was going to see that those changes were made." Id. at 4.  She does not recall whether Cypert was mentioned in that letter. Id. at 4-5.  Prather testified that Jackson requested that she fire Cypert. Id. at 11.  She did not discuss these requests with any one else. Id.

10

at 8.  Prather found Cypert to be an excellent employee.  Dkt. # 29-3, at 2.  Cottrell interviewed for the superintendent position in June 2008.  He testified that, at that interview, Meadows told him that he wanted the high school and elementary school principals gone.  Dkt. #29-6, at 3.  Cottrell did not testify that Meadows said anything to him about Cypert.

In September 2008, a petition was filed to impanel the grand jury to investigate wrongdoing or inappropriate behavior by the Board, particularly Traster, Hendrix, Meadows, and Jackson.  Dkt. # 29-12.  Cypert became aware of the petition shortly before it was filed.  Dkt. # 29-11, at 2.  She signed the grand jury petition.  Dkt. # 18-2, at 10.  She "also went out on a weekend or two and tried to get more signatures."  Dkt. # 18-2, at 10-11.  She stood outside two stores, with others, and asked people if they were interested in signing the petition.  Id. at 14.  She did not make her feelings known to the Board, but she did not hide them, either.  Id.  She did not speak with any of the Board members regarding the petition, and she did not make any public statements in support of the petition while Board members were present.  Id. at 12.

When asked what evidence she had of defendants' bias against her, Cypert testified that "they knew that I had participated in the request for a grand jury investigation.  They knew that it was my son that basically turned Ron Meadows'[s] son in for having stolen material from the school."  Dkt. # 18-2, at 42.  Cypert thinks that Meadows wanted "to get back at the people that had done his family wrong."  Dkt. # 18-2, at 46.  Cypert testified that, at some time "one guy came into a ball game stating that he was voting for Meadows because he was getting rid of the administration."  Dkt. # 18-2, at 47.

Horton testified that Cypert's name came up during Board meetings.  He testified that "she was mentioned to the point that they didn't like the way she run the office because she was letting

11

too many teenagers hang out in there.  She wasn't doing her job right.  That was mainly it."  Dkt. # 29-7, at 17.  He testified that nothing was said about Cypert's involvement with the investigation of Meadows's son.  Id.

On December 3, 2008, Meadows sent an e-mail to John Moyer of Rosenstien, Fist, and Ringold discussing Cottrell.  He stated, "I understand that Mr. Cottrell is continuing to bring Ms. Cypert to his office and that she has a key to his office.  The Board members have expressed their dissatisfaction with this but he continues to ignore.  Do we need to add another directive?"  Dkt. # 29-17, at 1.  Moyer replied, "Yes or a suspension of Cottrell."  Id.  There is no evidence to explain why Board members might have been upset that Cypert had a key to Cottrell's office.

E.     Removal of Extra Duty Assignments

The Prue Classroom Teachers' Association and the School Board entered into a Negotiations Agreement for the 2008-09 school year (the Negotiations Agreement).  Dkt. # 18-18.  The Negotiations Agreement lists extra duty assignments and fixes the compensation rates and duties for such assignments.  The Negotiations Agreement does not expressly provide that all extra duty assignments will be first offered to certified teachers or offered only to certified teachers.  Dkt. # 18-18, at 17-18.  Cypert does not dispute defendants' assertion that "[p]ursuant to the Negotiations Agreement, extra-duty contracts, including those of concession manager and cheerleading sponsor, are to be awarded to certified staff, i.e. teachers."  Dkt. ## 18, at 11; 29, at 8.  However, Cypert maintains that "she has been awarded extra duty contracts in previous years and that such provision

12

of the negotiated agreement was never followed and therefore was waived by the School District."[8] Dkt. # 29, at 8.

Meadows (who was the Board president at the time) told Cypert that giving non-certified staff extra duty assignments was a violation of the Negotiations Agreement. Dkt. # 18-2, at 28. Horton did not recall any objection from the teachers' union that the extra duty assignment policy was not being followed. Dkt. # 29-7, at 24. However, Cypert understood that extra duty contracts would be offered to certified teachers first. Dkt. # 18-2, at 28. Susan Baugher and Sandy Gilstrap were awarded the concession manager extra duty contract for the 2008-09 school year. Dkt. # 18-2, at 30. They were both certified teachers at the District for the 2008-09 school year. Id. At some point, Cypert's extra duty contract for the cheerleading sponsor assignment was not renewed.

On October 6, 2008, Steven Mitchell and the District entered into an Annual Employment Contract for Support Personnel. Dkt. # 29-24. Meadows testified that the Board entered into this contract with Mitchell thinking that Mitchell was a certified teacher. Dkt. # 18-17, at 5. The Negotiations Agreement provides a form of Certified Teacher Contract that differs from the support personnel contract that Mitchell and the District entered into. Dkt. # 18-8, at 28. On October 8, 2008, Mitchell and the District entered into a Certified Employee Extra Duty Assignment Contract for the extra duty assignment of Football and Basketball Coach. Dkt. # 29-24, at 4. Mitchell testified that the Board decided to hire Mitchell as football coach and a teacher in August, 2008. Dkt. # 18-17, at 4. He testified that Cottrell represented to the Board that he had looked at

---

[8]     Previous versions of the Negotiations Agreement are not part of the record on summary judgment. Therefore, the Court cannot determine whether the terms of such agreement changed for the 2008-09 school year.

13

Mitchell's teaching certificate. Id. at 5. He testified that the Board found out Mitchell did not have a teaching certificate in October. Id.

Cypert knew that "they was having to scramble to redo the schedules because they couldn't assign [Mitchell] the classes they had planned on doing." Dkt. # 18-2, at 24. Because of this scrambling, Cypert understood that the school district might be aware that Mitchell was not, in fact, a certified teacher. Dkt. # 18-2, at 25. Cypert testified that "[h]e still had to pass his test for certification, and he didn't do it." Dkt. # 18-2, at 25. Cypert learned this a few days before school started. Id. at 25-26. Despite the fact that he was not a certified teacher, Mitchell served as the football coach. Dkt. # 29-7, at 24.

Cypert has filed one charge of discrimination with the Equal Employment Opportunity Commission (EEOC). Dkt. # 18-2, at 20-21. Her charge (which was originally filed with the Oklahoma Human Rights Commission) states, "I was hired as a secretary. 'On or about August 11, 2008, I was told I could not be the concession manager because it was an extra duty assignment and only certified personnel could have extra duty assignments.' However, they hired a young non-certified male for extra duty assignment as the football coach." Dkt. # 18-19, at 1 (punctuation in original). When asked why the concession manager position was the only extra duty assignment mentioned on the EEOC form, Cypert stated, "that was an area that I missed when they sent this back for me to approve." Dkt. # 18-2, at 29.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986);

14

Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most favorable, Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

### III.

Cypert brings the following claims against defendants: 42 U.S.C. § 1983 claims for violation of her substantive and procedural due process rights and retaliation in violation of her free speech

rights; a Title VII claim for gender discrimination; an ADEA claim for age discrimination; and state law claims for breach of contract, unlawful interference with contract, and conspiracy to interfere with her rights.  Defendants seek summary judgment on all claims.

A.      Procedural Due Process

Cypert alleges that she was denied procedural due process in connection with her non-reemployment as high school secretary because the Board was biased at her hearing, Jones did not attend and was not available for cross-examination regarding his conclusions about the District's financial condition, and  Tarrant went into executive session with the Board before they voted to non-reemploy her.

The Fourteenth Amendment Due Process Clause prevents state actors from depriving plaintiffs of protected liberty or property interests without due process of law.  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  In this case, it is undisputed that Cypert's employment contract created a protected property interest in her continued employment because she was a long-term full time support employee, and gave her a right to a hearing before she was non-reemployed.

> At a minimum, the Due Process Clause . . . require[s] notice and an opportunity for hearing appropriate to the nature of the case before deprivation . . . . These basic requirements must be determined with consideration of both the nature of the state function involved as well as the private interests affected by the governmental action. And in connection with possible judicial interposition in cases like this, we must be mindful of the commitment in our Nation of public education to the control of state and local authorities.

Staton v. Mayes, 552 F.2d 908, 912 (10th Cir. 1977).  The hearing must be before an impartial tribunal.  Withrow v. Larkin, 421 U.S. 35, 46 (1975).  "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing."  Miller v. City of Mission, Kan., 705 F.2d

368, 372 (10th Cir. 1983).   However, "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair." Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 518 (10th Cir. 1998) (quoting Corstvet v. Boger, 757 F.2d 223, 229 (10th Cir.1985)).   The tribunal's honesty and integrity are presumed.   See Tonkovich, 159 F.3d at 518.   Therefore,"there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986).   The presence of even one biased member is enough to taint the tribunal and violate a plaintiff's due process rights.   Hicks v. City of Watonga, Okla., 942 F.2d 737, 738 (10th Cir. 1991).

Cypert alleges that her hearing was flawed because Meadows, Jackson, Traster, and Hendrix were biased against her.   In Staton, the plaintiff was a former school superintendent who was dismissed by the school board on charges of willful neglect of duty and incompetence.   Two members of the school board had previously voted against renewing the plaintiff's contract.   552 F.2d at 910.   One board member made campaign promises that he would vote for a change in the superintendent.   Id.   Before the hearing, two board members stated in a newspaper advertisement that "no progress could be made with school problems until there was a new superintendent."   Id. at 913.   The board members testified at trial that they based their decisions to terminate the plaintiff on the evidence presented at the due process hearing.   Id. at 914.   The Tenth Circuit held that the board members' public statements "reveal a tribunal not meeting the demands of due process for a hearing with fairness and the appearance of fairness."   Id.   The Staton court found that the statements went beyond "mere statements on a policy issue related to the dispute," and were "statements on the merits by those who must make factual determinations on contested fact issues of alleged

17

incompetence and willful neglect of duty, where the fact finding is critical." Id. Thus, "[t]he hearing involved the possibility of an erroneous and unfair factual decision . . . ." Id.

In McClure v. Independent School District No. 16, 228 F.3d 1205, 1215 (10th Cir. 2000), there was evidence that, prior to a principal's termination hearing, school board members stated they wanted the plaintiff gone and would pay money to get rid of her. The Tenth Circuit determined that these statements were akin to those made in Staton and created a genuine issue of material fact as to the school board's bias. Id. at 1216.

Meadows did not participate in Cypert's hearing in any manner. He did not vote on her employment, nor did he have the power to do so. Any bias that Meadows may have harbored towards Cypert is immaterial to Cypert's due process claim because he did not participate in the hearing. After he left the Board, Meadows owed no duty to provide Cypert with due process. Therefore, Meadows is entitled to summary judgment on Cypert's procedural due process claim.

Cypert's only evidence that Jackson was biased against her is Prather's testimony that Jackson once asked her to fire Cypert. This one statement does not rise to the level of the repeated public statements made by the defendants in Staton and McClure. Cypert's other evidence is her speculation that Jackson was biased against her because he was friends with Meadows. This does not amount to the "substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair." Tonkovich, 159 F.3d at 518. Jackson is entitled to summary judgment on Cypert's bias claim.

Cypert has provided no evidence that any of the other defendants was biased against her. Her mere speculation that Traster and Hendrix wanted to get back at her for signing the grand jury

petition or her involvement in the investigation of Meadows's son does not create a genuine issue of material fact as to bias.

Cypert's claim that she was denied due process because Tarrant entered the Board's executive session fails.  She does not explain how Tarrant's presence rendered the hearing inadequate or unfair.  The Oklahoma Open Meetings Act does not prohibit the presence of a non-member in a school board's executive session. See OKLA. STAT. tit. 25, § 307.  The Court finds nothing improper about Tarrant entering an executive session of the Board in which her recommendation would be discussed.

Cypert's claim that she was denied due process because Jones did not attend her hearing also fails.[9] Cypert was afforded the opportunity to cross-examine Tarrant regarding her recommendation. Cypert could have presented her own evidence regarding the District's financial condition to rebut Jones's prediction, and she chose not to.  Cypert presented no evidence that Tarrant's recommendation was based on inaccurate financial predictions.

For these reasons, defendants are entitled to summary judgment on Cypert's procedural due process claim.

B.      Substantive Due Process

Cypert asserts that her substantive due process rights were violated.  However, she has not explained how her substantive due process rights were violated, nor did she respond to defendants' arguments regarding substantive due process in her response to defendants' motion for summary judgment. See Dkt. # 29, at 16-21. Substantive due process protections "are accorded primarily 'to

_____

[9]      Absent from the record is any evidence that Cypert attempted to secure Jones's presence at the hearing.

matters relating to marriage, family, procreation, and the right to bodily integrity.'" <u>Williams v. Berney</u>, 519 F.3d 1216, 1220 (10th Cir. 2008) (quoting <u>Albright v. Oliver</u>, 510 U.S. 266 (1994)). "In extending these concepts to further bar 'certain government actions regardless of the fairness of the procedures used to implement them,' the Supreme Court has emphasized 'that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" <u>Williams</u>, 519 F.3d at 1220 (quoting <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998)).   Drawing all reasonable inferences in Cypert's favor, the Court finds that defendants' conduct does not rise to the level of a substantive due process violation.   Cypert's substantive due process claim fails as a matter of law.

C.   <u>Retaliation</u>

The First Amendment protects public employees' rights to speak as citizens on matters of public concern, and prevents public employers from retaliating against employees for such speech. The Tenth Circuit uses the five-step inquiry set out in <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968), as modified by <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), to analyze public employees' retaliation claims.   <u>See</u> <u>Rohrbough v. Univ. of Colo. Hosp. Auth.</u>, 596 F.3d 741, 745 (10th Cir. 2010).  The <u>Garcetti/Pickering</u> inquiry is:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

<u>Id.</u> (quoting <u>Dixon v. Kirkpatrick</u>, 553 F.3d 1294, 1302 (10th Cir. 2009)).  The first three steps are questions of law to be resolved by the district court, while the last two are ordinarily to be resolved

by the trier of fact. <u>Brammer-Hoelter v. Twin Peaks Charter Acad.</u>, 492 F.3d 1192, 1203 (10th Cir. 2007).

Cypert argues that the Board retaliated against her for her participation in the grand jury petition and the investigation into Meadows's son. With respect to the investigation, Cypert has provided no evidence of any specific statements or actions by her that could be the object of retaliation. Meadows was aware that Cypert's son participated in the investigation, but was not aware of any personal involvement by Cypert. Each of the defendants who voted on Cypert's non-reemployment states that he or she based his or her decision solely on the evidence and testimony presented at the June 8, 2009 hearing. Dkt. ## 18-12, at 2; 18-13, at 2; 18-14, at 2. Horton testified that Cypert's involvement in the investigation was not mentioned when she was discussed during Board meetings. Dkt. # 29-7, at 17. Cypert's mere speculation that Meadows and the other Board members were upset about the investigation does not create a genuine issue of material fact as to retaliation. <u>Cf.</u>, <u>Harvey v. Baker</u>, 242 Fed. App'x 547, 551 (10th Cir. 2007) (unpublished)[10] (holding that a plaintiff's vague, non-specific testimony was insufficient on its own to create a genuine issue of material fact that he engaged in protected speech, and noting that there was no evidence from any of the plaintiffs as to what they said and when); <u>Craven v. Univ. of Colo. Hosp. Auth.</u>, 260 F.3d 1218, 1226 (10th Cir. 2001) (describing plaintiff's allegation that she was terminated in retaliation for speech "on other matters" as "patently inadequate," and noting that "it is the place of counsel, not the [court], to identify the specific instances of speech upon which the plaintiff seeks to base her claim"); <u>Rankin v. Indep. Sch. Dist. No. I-3, Noble County, Okla.</u>, 876 F.2d 838, 847 (10th Cir.

---

[10]     Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1: 10th Cir. R. 32.1.

1989) (affirming a directed verdict in defendant's favor where there was no evidence of the content, form and context of any protected speech).

The only evidence Cypert has offered of specific public statements are her signature on the grand jury petition and her attempts to gather other signatures in support of the petition. Her support of the petition was not made pursuant to her official duties as a District employee. The Court will apply the Garcetti/Pickering analysis to this statement. The petition was a matter of public concern because it related to the administration of the District. Cypert's free speech rights outweigh any efficiency interest that the government may have in suppressing this speech. Therefore, the first three elements of the Garcetti/Pickering analysis are satisfied.

Although the latter two elements are often questions of fact for the jury, they may be resolved on summary judgment if there is no genuine issue of material fact. See, e.g., Couch v. Bd. of Trustees of Memorial Hosp., 587 F.3d 1223 (10th Cir. 2009) (affirming summary judgment in defendant's favor based on the fourth and fifth elements of the Garcetti/Pickering test). Cypert's evidence that her support of the petition was a motivating factor behind her termination is the temporal proximity between the petition and her termination and the vague hearsay statements that her name was mentioned in executive sessions of the Board.[11] With regard to causation under the third Garcetti/Pickering element, the Tenth Circuit has explained that,

> 'Although protected conduct closely followed by adverse action may justify an inference of retaliatory motive, the mere temporal proximity of Plaintiff's protected speech to the adverse action is insufficient, without more, to establish retaliatory motive.' We have explained, for instance, that it might be relevant in establishing a retaliatory motive that 'the employer expressed opposition to the employee's

---

[11]  Horton described Board members' negative comments about Cypert as relating to her job performance. There is no evidence that Board members discussed Cypert's involvement with the petition.

> speech,' or that 'the protected speech implicated the individual defendant in wrongdoing.' On the other hand, we also have explained that 'evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link.'

Id. at 1236 (internal citations omitted). The temporal proximity between the petition and Cypert's non-reemployment, without other evidence, is insufficient to create a genuine issue of material fact as to retaliation. Cypert has not provided any evidence that the defendants were even aware of her involvement with the petition. The decision to non-reemploy Cypert was made ten months after the grand jury petition was filed. Further, there is evidence of intervening events; particularly, the investigation into the financial condition of the school and Tarrant's recommendation that all support staff be notified of their possible non-reemployment. The connection between the petition and her non-reemployment is further weakened by the fact that Cypert was one of several employees notified of her possible non-reemployment. There is no evidence to suggest that the decision was personal. Cypert has failed to establish a genuine issue of material fact as to causation. Therefore, defendants are entitled to summary judgment on Cypert's First Amendment retaliation claim.

D.      Title VII and ADEA

Cypert alleges that she was discriminated against based on her gender and age when her extra duty contracts were removed. Defendants argue that the only discrimination claim over which this Court has jurisdiction is Cypert's claim relating to the removal of her concession manager extra duty assignment because her other claims are unexhausted. Cypert did not respond to the exhaustion argument in her response to defendants' motion for summary judgment. Dkt. # 29, at 28-29

"Exhaustion of administrative remedies is a 'jurisdictional prerequisite' to suit under Title VII." Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996); see also Ransom v. U.S. Postal Svc.,

170 Fed. App'x 525, 526-27 (10th Cir. Feb. 10, 2006) (affirming district court's dismissal for lack of subject matter jurisdiction where plaintiff failed to exhaust administrative remedies).  Therefore, the Court must determine whether Cypert has exhausted her administrative remedies regarding the allegations in her complaint.

Exhaustion of administrative remedies is a "'jurisdictional prerequisite' to suit under Title VII," Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996), and under the ADEA, Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005) (deciding that "our holdings on the jurisdictional effect of Title VII filings determine the jurisdictional effect of ADEA filings" and, therefore, that "a plaintiff's exhaustion of his or her administrative remedies is a jurisdictional prerequisite to suit under the ADEA").  A plaintiff seeking to bring a Title VII or ADEA claim in a district court must first have brought that claim in an EEOC complaint.  42 U.S.C. § 2000e-5; 29 U.S.C. § 626(d)(1); see also Shikles, 426 F.3d at 1308-09 (stating that the ADEA administrative process "tracks that of Title VII" and that "[t]o the extent that the charge filing requirements of the ADEA and Title VII are similar, courts must construe them consistently").  In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court held that, in order to exhaust remedies, a Title VII plaintiff must bring an EEOC complaint regarding each discrete act of discrimination for which she seeks redress in a district court.  See also Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003) ("each discrete incident of [discriminatory or retaliatory] treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted").  In the Tenth Circuit, this rule excludes unexhausted claims for discrete acts occurring both before and after a plaintiff's EEOC complaint.  Id. at 1210-11.

24

Cypert's EEOC complaint mentions the removal of only the concession manager duties; she filed no charges relating to the cheerleading sponsor or other assignments. Dkt. # 18-19, at 1. She has not exhausted administrative remedies regarding the other extra duty contracts. Therefore, the Court lacks jurisdiction over such claims.

Title VII prohibits discharging an employee because of his or her gender. 42 U.S.C. § 2000e-2(a)(1). The ADEA prohibits discharging an employee because of his or her age. 29 U.S.C. § 623(a)(1). Title VII and ADEA discrimination claims based on indirect or circumstantial evidence[12] are analyzed under the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Johnson v. Weld County, Colo, 594 F.3d 1202, 1210-11 (10th Cir. 2010) (Title VII); Hinds v. Sprint/United Mgmt., Co., 523 F.3d 1187, 1195 (10th Cir. 2008) (ADEA).

> Under McDonnell Douglas, the plaintiff carries the initial burden of establishing a prima facie case of . . . discrimination. Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. If the defendant makes this showing, the burden then shifts back to the plaintiff to show that the defendant's proffered justification is pretextual.

Young v. Dillon Cos., Inc., 468 F.3d 1243, 1249 (10th Cir. 2006) (internal citations omitted). In order to establish a prima facie case, a plaintiff must show that she was a member of a protected class, that she suffered an adverse employment action by her employer, that she was doing satisfactory work, and that she was treated less favorably than other similarly situated employees. Ortiz v. Norton, 254 F.3d 889, 894 (10th Cir. 2001).

---

[12]   Cypert offers no direct evidence of discrimination in this case.

Cypert's evidence that she was discriminated against is that, after her concession manager duties were removed, a younger male employee, Mitchell, was given the extra duty assignment of football coach.  Cypert does not explain how Mitchell was a similarly-situated employee.  The concession manager assignment was given to two female certified teachers whose ages are not contained in the record.  Cypert has failed to present any evidence that the decision to terminate her extra duty contract was motivated by either her age or her gender.[13]  Cypert has failed to establish a prima facie case of gender or age discrimination.  However, even if she had established a prima facie case, her Title VII and ADEA claims would fail because she has failed to produce any evidence that defendants' reason for terminating her extra duty assignment was a pretext for discrimination.  While Mitchell's extra duty assignment could be evidence that the District's proffered reason for the removal of concession manager duties was pretextual, Cypert has offered no evidence from which it could be inferred that it was a pretext for the sort of discrimination prohibited by Title VII or the ADEA.  Therefore, defendants are entitled to summary judgment on Cypert's Title VII and ADEA claims.

E.     Breach of Contract, Interference with Contract, and Conspiracy Claims

Cypert's remaining claims arise under state law.  Defendants are entitled to summary judgment on all of Cypert's federal law claims.  See Parts III. A-D, supra.  Cypert's remaining claims arise under state law.  All parties are residents of Oklahoma.  See Dkt. # 29-11, at 3 (Cypert's testimony that she could sign the grand jury petition because she was a resident of Osage County, Oklahoma); Case No. 09-CV-0458-CVE-FHM, Dkt. # 51 (Defendants' Notice of Citizenship).

---

[13]     Cypert's allegations are so devoid of even a suggestion of discrimination that the Court is left with the impression that she decided to file her Title VII and ADEA claims merely as an afterthought.

Therefore, the Court does not have diversity jurisdiction over Cypert's state law claims.  28 U.S.C. § 1332.

Pursuant to 28 U.S.C. § 1367(a), federal courts may exercise supplemental jurisdiction over claims related to claims over which it has original jurisdiction.  A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3); Gaston v. Ploeger, 297 Fed. App'x 738, 746 (10th Cir. 2008) (unpublished)[14] (stating that § 1367(c)(3) expressly permits a district court to decline to exercise supplemental jurisdiction over remaining state law claims after granting summary judgment in favor of defendant on federal law claims).  This Court does not have original jurisdiction over Cypert's breach of contract, interference with contract, and conspiracy claims because those claims arise under state law and diversity jurisdiction is not present.  The decision to exercise supplemental jurisdiction is discretionary, but courts should consider "the nature and extent of pretrial proceedings, judicial economy, convenience, and [whether] fairness would be served by retaining jurisdiction."  Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995) (quoting Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990)).

The parties have engaged in discovery, and the pretrial conference is scheduled for September 1, 2010.  The Court finds that the extent of pretrial proceedings does not outweigh the interests that would be served by having Cypert's state law claims tried in a state court.  Judicial economy would be served by having the Oklahoma courts resolve issues of Oklahoma law, and the parties have an interest in having their Oklahoma law disputes decided in a court intimately familiar

---

[14]    Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. P. 32.1: 10th Cir. R. 32.1.

with that law.  Further, the Tenth Circuit has "repeatedly recognized that this is the preferred practice." <u>Gaston</u>, 297 Fed. App'x at 746;[15] <u>see</u> <u>Smith v. City of Enid</u>, 149 F.3d 1151, 1156 (10th Cir. 1998) ("[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims"); <u>Ball v. Renner</u>, 54 F.3d 664, 669 (10th Cir. 1995) (noting that there are "the best of reasons" for a district court to defer to a state court rather than retaining and disposing of state law claims).  The Court declines to exercise supplemental jurisdiction over Cypert's state law claims.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Dkt. # 17) is **granted in part and moot in part**.  It is granted with respect to plaintiff's federal law claims and is moot with respect to plaintiff's state law claims.

**IT IS FURTHER ORDERED** that plaintiff's state law claims are dismissed for lack of subject matter jurisdiction.

**IT IS FURTHER ORDERED** that Defendants' Motion in Limine Regarding Anticipated Testimony of Plaintiff's Expert Witness Bill Bentley and Opening Brief in Support (Dkt. # 25) is **moot**.

**DATED** this 31st day of August, 2010.

_Claire V Eagan_
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[15]     Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. P. 32.1: 10th Cir. R. 32.1.